**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 25-2232**

───────────

GERT JANNES KUIPER,

Plaintiff - Appellee,

v.

MARIO ADALBERTO REYES MENA,

Defendant - Appellant.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Rossie David Alston, Jr., District Judge.  (1:24-cv-01785-RDA-LRV)

───────────

Argued:  May 5, 2026                                    Decided:  July 8, 2026

───────────

Before NIEMEYER, GREGORY, and AGEE, Circuit Judges.

───────────

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Gregory and Judge Agee joined.

───────────

**ARGUED:**  Kang He, MCGUIREWOODS LLP, Tysons, Virginia, for Appellant.  Jason P. Hipp, JENNER & BLOCK, LLP, New York, New York, for Appellee.  **ON BRIEF:** Jonathan Y. Ellis, H. Brent McKnight, Jr., Raleigh, North Carolina, Carolina G. Amarant, MCGUIREWOODS LLP, Tysons Corner, Virginia, for Appellant.  Daniel McLaughlin, Claret Vargas, CENTER FOR JUSTICE & ACCOUNTABLITY, San Francisco; Lawrence W. McMahon, Washington, D.C., Peter C. Welch, Los Angeles, California, Justin J. Gillette, JENNER & BLOCK LLP, Chicago, Illinois, for Appellee.

───────────

NIEMEYER, Circuit Judge:

During the Salvadoran civil war — particularly in March 1982 — Mario Adalberto Reyes Mena, a colonel in the Salvadoran Security Forces, ordered the ambush and killing of four Dutch journalists who were on assignment to El Salvador from a media outlet affiliated with the Protestant Church of the Netherlands. The Salvadoran Security Forces considered the journalists' reporting, which was sympathetic to the opposition, to be a threat. Jan Kuiper was one of the four journalists who were killed.

Gert Kuiper, Jan Kuiper's brother, commenced this action against Reyes Mena under the Torture Victim Protection Act of 1991, seeking declaratory relief and damages for the "extrajudicial killing" of his brother. In response, Reyes Mena filed a motion to dismiss the complaint based on, among other things, sovereign immunity under common law for foreign officials acting on behalf of a government — *i.e.*, "foreign official immunity." *See Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012). But, as we noted in *Yousuf*, the immunity does not protect foreign officials accused of a violation of *jus cogens* norms — "mandatory or peremptory norm[s] of general international law . . . from which no derogation is permitted," *Black's Law Dictionary* 1026 (12th ed. 2024). *See* 699 F.3d at 775–77. And these norms include a prohibition on extrajudicial killing, whether or not committed in the official capacity of a sovereign. Because Jan Kuiper's killing was allegedly extrajudicial, we affirm the district court's order denying foreign official immunity and remand for further proceedings.

I

Between 1980 and 1992, the government of El Salvador and its military forces (the Salvadoran Security Forces or Salvadoran military) were engaged in a civil war with the Farabundo Marti National Liberation Front ("FMLN"), a coalition of communist guerilla groups. After the war was settled in 1992 by the Chapultepec Peace Accords, a United Nations Truth Commission concluded that more than 75,000 civilians had been killed and another 8,000 had disappeared during the war, and it attributed most of the losses to actions of the Salvadoran military.

The U.N. Truth Commission found that during the war, the Salvadoran Security Forces considered journalists to be a particular threat because independent media coverage of the Salvadoran Security Forces' human rights abuses imperiled the support that the Salvadoran government was receiving from allies. Accordingly, the Salvadoran Security Forces systematically targeted journalists and news outlets — both foreign and domestic — that did not report favorably on the government, and members of the media were threatened, attacked, killed, or disappeared.

In February 1982, four Dutch journalists — Jan Kuiper, Koos Koster, Johannes Willemsen, and Hans ter Laag — traveled to El Salvador on assignment from a media outlet affiliated with the Protestant Church of the Netherlands to report on the civil war. As of that time, Kuiper and Koster had already published stories critical of the Salvadoran Security Forces, including a documentary on government-aligned death squads. Koster had also interviewed Archbishop Oscar Romero, a peace advocate who was later assassinated on government orders. As they had planned, the Dutch journalists began a

3

trip to Chalatenango on March 17, 1982, to visit an FMLN-controlled territory. For the first portion of the trip, they traveled in a mini-bus marked "PRENSA" (Press) with an FMLN escort, although the bus driver observed that they were being followed by what he believed to be a Salvadoran military vehicle. The journalists then exited the mini-bus and proceeded, unarmed, on foot through a hollow between two overlooking hills, with FMLN guerillas as guides. The U.N. Truth Commission found that the Salvadoran Security Forces had known in advance of the Dutch journalists' planned trip and that officers of the Fourth Infrantry Brigade under the command of Colonel Reyes Mena had met to plan an ambush of the journalists as they passed through the hollow.

According to the plan, patrols were stationed on top of the two hills to carry out the ambush. As the journalists proceeded on foot through the hollow, the patrols fired on them, killing all four journalists, including Jan Kuiper, and all but one of the FMLN guides. After the patrols reported back to the Salvadoran Security Forces base, Colonel Reyes Mena dispatched a vehicle to pick them up.

The U.N. Truth Commission found that "the ambush was set up deliberately to surprise and kill the journalists and their escort; that the decision to ambush them was taken by Colonel Mario A. Reyes Mena, Commander of the Fourth Brigade, with the knowledge of other officers; that no major skirmish preceded or coincided with the shoot-out on which the journalists were killed; and lastly that [Reyes Mena] and other soldiers concealed the truth and obstructed the judicial investigation." The Commission also concluded that the Salvadoran government had failed to meet its obligation to investigate, bring to trial, and punish guilty parties, as required by international law.

4

Similarly, a U.S. military investigation conducted shortly after the ambush concluded that the patrol was set up in a tactical position atop two hills overlooking the path below where the Dutch journalists had planned to pass, creating a "kill zone" that bore the hallmarks of a classic ambush. The investigation found "no extensive evidence of guerilla fire."

Years later, in November 2022, a Salvadoran court indicted three former officers of the Salvadoran Security Forces, including Reyes Mena, for killing the Dutch journalists. Two of the former officers resided in El Salvador and were arrested there, but Reyes Mena, who lived in Virginia, was able to avoid arrest by foregoing travel to El Salvador. In July 2025, a jury in El Salvador convicted Reyes Mena *in absentia* for the killings of the Dutch journalists.

Gert Kuiper, the brother of Jan Kuiper, commenced this action in October 2024, alleging that Reyes Mena's participation in the killing of Kuiper's brother violated the Torture Victim Protection Act of 1991 ("TVPA"), which creates a cause of action against a foreign official for torture or extrajudicial killing. Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). Kuiper sought a declaratory judgment that Reyes Mena was responsible for the extrajudicial killing of his brother Jan, as well as compensatory and punitive damages.

Reyes Mena filed a motion to dismiss the complaint, asserting, among other defenses, that he was entitled to conduct-based foreign official immunity under international common law. The district court denied Reyes Mena's claim of such immunity because "the alleged extrajudicial killing qualifie[d] as a violation of *jus cogens*." The

5

court noted that "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." (Quoting *Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012)).

From the district court's order dated September 10, 2025, Reyes Mena filed this interlocutory appeal challenging the denial of his claimed immunity. *See Yousuf*, 699 F.3d at 768 n.1 (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

II

Fundamental to the relationship of nations within the international community are grace and comity — the mutual respect of each other's independence. *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812). Thus, one nation's acts "are not properly the subject of adjudication in the courts of another government." *Underhill*, 168 U.S. at 254. As a consequence, international common law has recognized that foreign states, as well as officials acting within the scope of their office for those states, may be immune from suit. *See Samantar v. Yousuf*, 560 U.S. 305, 311–12 (2010); *Yousuf*, 699 F.3d at 774 (noting that "any act performed by the individual as an act of the State enjoys the immunity which the State enjoys" (cleaned up)); *Restatement (Second) of Foreign Relations Law* § 66(f) (A.L.I. 1965). Conduct-based foreign *official* immunity — which is sovereign immunity extended to acts of officials — applies to "any . . . public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of [a court's] exercising

6

jurisdiction would be to enforce a rule of law against the state." *Yousuf*, 699 F.3d at 774 (quoting *Restatement (Second) of Foreign Relations Law* § 66(f)).

This common-law immunity for foreign states and their officials is recognized in U.S. courts through a two-step procedure. To take the first, the foreign state or official requests a "suggestion of immunity" from the U.S. Department of State. And at the second, if the request is granted, the court generally surrenders jurisdiction. *Samantar*, 560 U.S. at 311–12. In the absence of the State Department's recognition of immunity, the court can nonetheless determine whether immunity applies under the common law. *See id.* In either event, the State Department's position on a foreign official's immunity carries "substantial weight" in the court's analysis of the issue. *Yousuf*, 699 F.3d at 773.

In short, foreign states or nations and their officials acting in their official capacity were, at common law, generally immune from suit in the U.S. courts. The officials, however, were not immune from liability for their private acts. *See Yousuf*, 699 F.3d at 775; *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106 (9th Cir. 1990).

In 1976, Congress enacted the Foreign Sovereign Immunities Act ("FSIA"), which codified the common law as it applied to *foreign states*, providing that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. The Supreme Court has made clear that the statutory immunity granted by the FSIA does not apply to *foreign officials* acting on behalf of the state. *See Samantar*, 560 U.S. at 305 (holding that an individual foreign official sued for conduct undertaken in his official capacity does not qualify as a "foreign state" entitled to immunity from suit

7

under the FSIA"). Rather, the Court observed, the immunity of *foreign officials* remains governed by the common law, as it existed before the enactment of the FSIA. *Id.* at 324.

Notwithstanding common-law immunity of foreign officials for their official acts, international law recognizes that there are certain types of conduct that amount to atrocities against humanity and therefore are not protected by immunity — including torture, genocide, extrajudicial executions, and others, all of which are not considered to be sovereign acts. Such conduct violates *jus cogens* norms — meaning in Latin, compelling or mandatory law — which preempt other law. As we have explained:

> A *jus cogens* norm, also known as a "peremptory norm of general international law," can be defined as "a norm accepted and recognized by the international community of States as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character."

*Yousuf*, 699 F.3d at 775 (quoting Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 331); *see also Restatement (Third) of Foreign Relations Law* § 102 cmt. k (A.L.I. 1987); Jus Cogens, *Black's Law Dictionary* 1026. *Jus cogens* norms include "the prohibitions against genocide; slavery or slave trade; murder or disappearance of individuals; torture or other cruel, inhuman, or degrading treatment or punishment; [and] prolonged arbitrary detention." *Yousuf*, 699 F.3d at 775 (quoting Evan J. Criddle & Evan Fox-Decent, *A Fiduciary Theory of Jus Cogens*, 34 Yale J. Int'l L. 331, 331 (2009)); *see also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984) (Edwards, J., concurring); *Restatement (Third) of Foreign Relations Law* § 702 cmt. n. Violations of these norms, even when committed as official acts of a foreign state, are acts that international law does not recognize as sovereign acts for which an official is entitled to

8

immunity. *Yousuf*, 699 F.3d at 776 (citing *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 718 (9th Cir. 1992) ("International law does not recognize an act that violates *jus cogens* as a sovereign act")).

Thus, under international common law, while foreign officials may obtain immunity for official acts that the official committed on behalf of the state, that immunity will not protect the official's violation of *jus cogens* norms.

With these applicable principles in hand, we address Reyes Mena's appeal.

III

Reyes Mena contends that he meets all of the requirements for conduct-based foreign official immunity and therefore that the district court erred in denying him immunity. As he argues:

> After all this action is not really about Reyes Mena. It is about a military operation that Plaintiff alleges the Salvadoran government authorized and conducted through officials like Reyes Mena. Adjudicating this dispute would require U.S. courts to sit in judgment over the Salvadoran government's military operations and strategy during its civil war. Foreign immunity is designed to prevent that result.

(Citing *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691 n.7 (1976) ("The courts of one country will not sit in judgment on the acts of the government of another done within its own territory" (cleaned up)); *Underhill*, 168 U.S. at 252–53 ("Where a civil war prevails . . . generally speaking, foreign nations do not assume to judge of the merits of the quarrel")).

Reyes Mena confirms that, as a former colonel in the Salvadoran military, he was clearly an official and that he acted in an official capacity, since his alleged ordering of the

9

killing was consistent with El Salvador's war-time strategy and was backed by high-ranking government officials.  Thus, he argues that any decision by a U.S. court on the legality of those actions would have the effect of enforcing a rule of law against El Salvador.

Kuiper argues to the contrary that Reyes Mena's actions were not performed in an official capacity, since El Salvador has disavowed the actions and criminally prosecuted Reyes Mena for them.  Kuiper notes further that he brought this action against Reyes Mena in his personal capacity such that the court's exercise of jurisdiction would not be to "enforce a rule of law against the state."

The parties' debate over whether Reyes Mena's conduct meets the requirements for conduct-based foreign official immunity is, however, of no moment in this appeal.  The issue presented here is whether foreign official immunity is available for violations of *jus cogens* norms, which is the basis on which the district court ruled.  And it is that issue that we must address.

In focusing on *jus cogens*, Reyes Mena contends that the district court erred in adopting "a categorical exception to immunity for alleged violation of *jus cogens* norms . . . [and in concluding] that 'the alleged extrajudicial killing in this case qualifies as a violation of *jus cogens*' that defeats [his] claim to conduct-based immunity."  He asserts that

> there is no general *jus cogens* exception to common-law, conduct-based foreign official immunity, and *Yousuf* does not apply.  The district court thus reversibly erred in denying Reyes Mena the benefit of conduct-based immunity. . . .  As a matter of both international and U.S. law, there is no general *jus cogens* exception to conduct-based immunity.

10

He explains that creating such an "exception" defeats the comity among nations that foreign sovereign immunity was designed to serve.

Reyes Mena, however, hardly supplies governing legal support for this argument.

To begin, we note that as a matter of concept, *jus cogens* norms are not thought to be an "exception" to immunity. Rather, conduct that violates a *jus cogens* norm is understood as not constituting a sovereign act that would be protected by sovereign immunity. *See, e.g.*, *Siderman de Blake*, 965 F.2d at 718. In failing to recognize this principle, Reyes Mena's logic proceeds down the wrong track.

*Jus cogens* is understood to be a peremptory norm of international law from which no derogation is permitted, and the concept has its roots in Roman law and the work of classical publicists. Criddle & Fox-Decent, *supra* at 334 & n.6 (citing, *e.g.*, Hugo Grotius, *On the Law of War and Peace* (William Whewell ed. & trans., John W. Parker, London 2009) (1625)). The concept gained "enhanced recognition and credibility following the Second World War," as "the prosecution of Axis leaders at Nuremberg and Tokyo offered compelling evidence that international law did, indeed, impose *substantive limits on the invocation of state sovereignty* as a shield for officials accused of crimes against humanity." *Id.* at 336 & n.18 (emphasis added) (citing Lauri Hannikainen, *Peremptory Norms (Jus Cogens) in International Law: Historical Development, Criteria, Present Status* 150 (1988)).

More recently, in the Vienna Convention on the Law of Treaties, the parties have recognized that a *jus cogens* norm is "a norm accepted and recognized by the international community of States as a whole . . . from which no derogation is permitted." *Supra*, at art.

11

53. And this is similarly recognized in the Restatement of Foreign Relations Law, which provides that "[p]eremptory norms of international law (*jus cogens*) . . . are recognized by the international community of states as peremptory, permitting no derogation." *Restatement (Third) of Foreign Relations Law* § 102 cmt. k. And most important to this appeal, we have recognized these principles, concluding that violations of *jus cogens* norms, even when committed under the color of law, are "as a matter of international and domestic law . . . by definition, acts that are not officially authorized by the Sovereign." *Yousuf*, 699 F.3d at 776 (citing, *e.g.*, *Siderman de Blake*, 965 F.2d at 718 ("International law does not recognize an act that violates *jus cogens* as a sovereign act")); *see also Warfaa v. Ali*, 811 F.3d 653, 661 (4th Cir. 2016). We have thus held that, "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." *Yousuf*, 699 F.3d at 777. This conclusion has also been reached by courts of other nations. *See, e.g.*, *Att'y Gen. of Israel v. Eichmann*, 16 Piske Din 2033 (1962), 36 I.L.R. 277, 309–10 (1968) (Isr.) ("[A]cts prohibited by the law of nations . . . are completely outside the 'sovereign' jurisdiction of the State that ordered or ratified their commission, and therefore those who participated in such acts must personally account for them and cannot shelter behind the official character of their task or mission"); *Regina v. Bartle, ex parte Pinochet*, [1999] 2 W.L.R. 827 (HL) 846–48 (appeal taken from Eng.) (concluding that immunity is unavailable to former foreign official accused of directing widespread torture because such acts do not constitute officially approved acts).

In sum, "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." *Yousuf*, 699 F.3d at 777. And accordingly, Reyes Mena would not be entitled to foreign official immunity on a motion to dismiss if the acts attributed to him in the complaint are indeed violations of *jus cogens* norms.

The substantive nature of these peremptory norms are not seriously disputed, even by Reyes Mena. The Restatement of Foreign Relations Law provides a list that includes "genocide," "the murder or causing the disappearance of individuals," and "torture," among others, as "peremptory norms (*jus cogens*)." *Restatement (Third) of Foreign Relations Law* § 702 cmt. n. Similarly, the Torture Victim Protection Act of 1991 creates a cause of action for "torture" or "extrajudicial killings." 28 U.S.C. § 1350 note. And in *Yousuf*, we listed prohibitions on "torture, summary execution and prolonged arbitrary imprisonment" as among those "universally agreed-upon norms." 699 F.3d at 775; *see also Tel-Oren*, 726 F.2d at 791 n.20 (Edwards, J., concurring) (noting that "on the basis of international covenants, agreements and declarations, commentators have identified at least four acts that are now subject to unequivocal international condemnation: *torture, summary execution, genocide and slavery*" (emphasis added)). Professors Criddle and Fox-Decent have also noted, as the result of their extensive research, that "*jus cogens* . . . include[s], at a minimum, the prohibitions against *genocide*; slavery or slave trade; *murder* or disappearance of individuals; *torture* or other cruel, inhumane or degrading treatment or punishment; [and] prolonged arbitrary detention." Criddle & Fox-Decent, supra at 331–32 (emphasis added).

13

Thus, at a minimum, *jus cogens* norms include prohibitions on torture, summary or extrajudicial executions, and genocide.

In this case, Reyes Mena is alleged to have known about the Dutch journalists' travel plans, participated in a meeting to plan an ambush on them, and, as the commanding officer, ordered their extrajudicial killing. This alleged conduct violates a *jus cogens* norm and therefore it may not be protected by conduct-based foreign official immunity. As we held in *Yousuf*, "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity." 699 F.3d at 777.

Accordingly, we affirm the district court's order to the extent that it rejected Reyes Mena's claim for conduct-based foreign official immunity.

IV

Reyes Mena makes several arguments in an effort to circumvent our conclusion. We find, however, that none are persuasive.

A

First, Reyes Mena argues that "*Yousuf* does not apply here," because "*Yousuf* denied foreign official immunity for alleged violations of *jus cogens* norms to an official from a foreign State [Somalia] *without a recognized government* to whom comity and immunity could be owed," and he, by contrast, "is a former official that allegedly acted on behalf of a recognized government — indeed, a U.S. ally." (Emphasis added). This argument, however, takes an overly limited view of *Yousuf.* Our holding in *Yousuf* did not rely on

14

the status of the Somali government, but instead on the nature of the defendant's actions, which violated *jus cogens* norms and thus could not be considered to be sovereign acts. While we did acknowledge that the State Department had taken a position opposing the defendant's immunity, in part because he was "a former official of a state with no currently recognized government to request immunity on his behalf," *Yousuf*, 699 F.3d at 767, we made clear that our holding did not rely on that observation, expressly noting that the State Department's guidance had "supplied us with *additional reasons* to support" the conclusion that the defendant was not entitled to immunity. *Id.* at 778 (emphasis added). Reyes Mena's argument to distinguish *Yousuf* thus does not reach its holding, which governs.

B

Reyes Mena next argues that no *jus cogens* exception applies to his claim of foreign official immunity because Congress did not include such a general *jus cogens* exception in the FSIA, which created immunity for sovereign states. The Supreme Court, however, has rejected similar arguments. In *Samantar v. Yousuf*, the Court recognized that the petitioner "argue[d] that we should construe the FSIA consistently with the common law regarding individual immunity, which—in petitioner's view—was coextensive with the law of state immunity and always immunized a foreign official for acts taken on behalf of the foreign state." 560 U.S. at 320. But the Court dismissed that argument, noting that "[e]ven reading the Act in light of Congress' purpose of codifying *state* sovereign immunity, however, we do not think that the Act codified the common law with respect to the immunity of

15

*individual officials.*"  *Id.* (second emphasis added).  As such, the *Samantar* Court made clear that the FSIA does not define the contours of foreign sovereign immunity for individual officials.

And with regard to the common law for individual officials, we have noted, when rejecting conduct-based immunity for a *jus cogens* violation in *Yousuf*, that "Congress's enactment of the TVPA, and the policies it reflects, [were] both instructive and consistent with our view of the common law regarding . . . *jus cogens*."  699 F.3d at 777.  More specifically, we explained that "in enacting the TVPA, Congress essentially created an express private right of action for individuals victimized by torture and extrajudicial killing that constitute violations of *jus cogens* norms."  *Id.*; *see also Lewis v. Mutond*, 918 F.3d 142, 148 (D.C. Cir. 2019) (Srinivasan, J., concurring) ("[The TVPA] subjects foreign officials to liability for acts undertaken in an official capacity and thus displaces any common-law, conduct-based immunity that might otherwise apply in the context of claims under the Act").

Therefore, we cannot agree with Reyes Mena's argument that the absence of a *jus cogens* "exception" in the FSIA's statutory provisions is "instructive to whether such [an] exception exists in [the] common-law immunity afforded to officials."

C

Reyes Mena also takes issue with the application of *jus cogens* norms to foreign official immunity in the context of a civil suit, rather than a criminal prosecution.  He contends that while "some foreign courts have abrogated conduct-based immunity for *jus*

16

*cogens* violations" in the criminal context, that recognition "provides no basis for a categorical exception in civil cases."

His argument, however, is directly foreclosed by our prior holding in *Yousuf*, which recognized the application of *jus cogens* norms in a civil case brought under the TVPA and the Alien Tort Statute.  699 F.3d at 763; *see also Warfaa*, 811 F.3d at 661 (holding that a former colonel in the Somali military was not entitled to foreign official immunity from civil claims brought under the TVPA).

Moreover, applying *jus cogens* only in a criminal context would belie the peremptory, universal nature of the norms.  As noted above, the application of *jus cogens* norms to deny immunity to foreign officials — when the officials commit acts that are atrocities against humanity — is explained by refusing to recognize that they are legitimate, sovereign acts.  *See Yousuf*, 699 F.3d at 776 ("[A]s a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign"); *see also Siderman de Blake*, 965 F.2d at 718 ("International law does not recognize an act that violates jus cogens as a sovereign act").  This reasoning does not depend on the civil or criminal context in which *jus cogens* is applied.  Whether a proceeding is civil or criminal does not change the nature of the act in question and therefore does not alter the availability or unavailability of immunity for that particular conduct.  As one scholar persuasively reasoned, "[I]f there is no immunity from criminal proceedings, then it is not clear as a doctrinal matter why there would nevertheless be immunity from civil proceedings for the same conduct."  Chimene I. Keitner, *Foreign*

17

*Official Immunity After* Samantar, 44 Vand. J. Transnat'l L. 837, 848 (2011) (footnote omitted).

D

Finally, Reyes Mena argues that "if the Court interprets *Yousuf* broadly as adopting a general *jus cogens* exception to immunity that would apply even to this case, *Yousuf* should be overruled." He does acknowledge that he is making this argument for preservation purposes should the issue be considered en banc. Despite that possibility, however, we have already rejected an argument that *Yousuf* was wrongly decided. *See Warfaa*, 811 F.3d at 661 (The defendant "would have us overrule [*Yousuf*], but that course is not open to us"). In *Warfaa*, we reiterated *Yousuf's* holding that "foreign official immunity could not be claimed for *jus cogens* violations, even if the acts were performed in the defendant's official capacity," *id.* at 661 (cleaned up), and concluded that the district court had properly held that a former Somali colonel accused of attempted extrajudicial killing was not entitled to foreign official immunity on a claim under the TVPA, *id.* at 655, 657.

\*      \*      \*

In his complaint, Kuiper alleged that Reyes Mena ordered the ambush and killing of his brother, Jan Kuiper, an unarmed journalist. We conclude that the alleged conduct, if proved, would amount to a violation of the *jus cogens* norm of international law prohibiting extrajudicial killing and therefore that such a violation would preclude conduct-based foreign official immunity. Accordingly, we affirm the district court's order of

September 10, 2025, to the extent it denies Reyes Mena conduct-based foreign official immunity.

AFFIRMED